[Cite as *State v. Herring*, 2011-Ohio-662.]

STATE OF OHIO, MAHONING COUNTY
IN THE COURT OF APPEALS

SEVENTH DISTRICT

STATE OF OHIO,                      )

                                        )

        PLAINTIFF-APPELLEE,      )

                                          )

VS.                                    )          CASE NO. 08-MA-213

                                        )

WILLIE HERRING,            )                OPINION

                                        )

        DEFENDANT-APPELLANT.    )

| | |
|---|---|
| CHARACTER OF PROCEEDINGS: | Criminal Appeal from Court of Common Pleas of Mahoning County, Ohio Case No. 96CR339 |
| JUDGMENT: | Reversed and Remanded for Resentencing |

APPEARANCES:

| | |
|---|---|
| For Plaintiff-Appellee | Paul Gains Prosecutor Ralph M. Rivera Assistant Prosecutor 21 W. Boardman St., 6th Floor Youngstown, Ohio 44503 |
| For Defendant-Appellant | Attorney Kimberly S. Rigby Attorney Jennifer A. Prillo Assistant State Public Defenders 8 East Long Street, 11th Floor Columbus, Ohio 43215 |

JUDGES:

Hon. Gene Donofrio
Hon. Joseph J. Vukovich
Hon. Cheryl L. Waite

Dated: February 11, 2011

DONOFRIO, J.

{¶1} Defendant-appellant, Willie Herring, appeals from a Mahoning County Common Pleas Court judgment denying his petition for postconviction relief.

{¶2} The following facts were set out by the Ohio Supreme Court in appellant's direct appeal.

{¶3} "Shortly after midnight on April 30, 1996, five masked gunmen intent on robbery entered the Newport Inn, a bar in Youngstown. They shot five people, robbed the till, and left. Three of the five victims died. One of the gunmen, Willie S. 'Stevie' Herring, is the appellant in this case. He was convicted of three counts of aggravated murder and sentenced to death on each count.

{¶4} "Herring's partners in crime were Adelbert Callahan, Antwan Jones, Eugene Foose, Louis Allen, and Kitwan Dalton. On the night of April 29, 1996, these five gathered at Herring's house. At one point, Callahan and Jones left the house for about fifteen minutes before returning with a stolen van.

{¶5} "Herring and the others got into the van, Callahan taking the wheel. Callahan drove to a blue house on Laclede Avenue near Hillman Street and Rosedale Avenue. Herring went inside the blue house and came back with four guns. He gave a .38 special to Allen, a 9 mm pistol to Callahan, and a .357-caliber pistol to Jones. He did not give a gun to Foose, who was already carrying a .45, or to Dalton, who was to be the getaway driver. Herring kept a 9 mm Cobray semiautomatic for himself.

{¶6} "Herring then said to the others, 'If you all know like I know, then you all want to get paid.' It turned out that all six needed money. They therefore decided to commit a robbery. Foose suggested the Newport Inn as a target. Callahan drove the van there.

{¶7} "Everyone but Dalton got out of the van carrying a gun. They put on disguises. Herring donned a white Halloween mask, which Dalton agreed was a 'store-bought' mask similar to one seen in 'slasher' movies. No one else had such a mask; the others hid their faces with bandanas or, in Allen's case, a T-shirt. Herring,

Allen, and Foose went to the back door of the Newport Inn; Callahan and Jones took the front door.

**{¶8}** "Ronald Marinelli, the Newport Inn's owner, was tending bar that night. He had six or eight customers, including Deborah Aziz, Herman Naze, Sr., Dennis Kotheimer, and Jimmie Lee Jones. Jones was sitting with a woman at a table in the back.

**{¶9}** "Sometime between 1:45 and 2:15 a.m., the robbers burst in. Hearing a sound like a gunshot, Marinelli looked and saw four armed black males in the bar. The two at the front door were disguised in dark bandanas. One carried a revolver; one had what looked to Marinelli like a 9 mm semiautomatic pistol. Marinelli saw two more at the rear. One wore a bandana, the other a 'white hockey-type mask.' Herring, in the white mask, carried a 'very distinctive' gun, which looked like an Uzi or a MAC-10, squarish in shape, with a long clip. Allen, entering last through the back door, saw Jimmie Lee Jones already lying on the floor. At a nearby table, a woman was screaming. Allen told her to be quiet. Then he returned to the van.

**{¶10}** "One of the other gunmen ordered Herman Naze: 'Give me your fucking money.' 'I don't have any money,' Naze replied. The gunman immediately shot him. Then Herring shot Deborah Aziz, who fell to the floor. She managed to crawl away and hide between a cooler and a trash can. She later described her assailant's mask as 'a hard plastic, like one of those Jason masks.'

**{¶11}** "Now Herring walked around the end of the horseshoe bar toward Marinelli and the cash register. As he approached, he shot Marinelli four times in the stomach from about five feet away.

**{¶12}** "Somehow Marinelli managed to stay on his feet as Herring came closer. Herring stopped about a foot away from him. Marinelli noticed his assailant's long reddish-orange hair. Despite the mask, Marinelli could also see that his assailant had an 'odd skin pigment,' large eyes 'almost like a hazel' color, and buckteeth.

{¶13} "Herring said, 'Give me your fucking money.' Despite his wounds, Marinelli obeyed, handing over the cash in the register. But the robber screamed that Marinelli hadn't given him everything. He had guessed right: in a nearby drawer there was some cash belonging to a pool league.

{¶14} "As Herring threatened to 'blow [Marinelli's] brains out,' Marinelli gave him the money from the drawer. Herring screamed for more. Marinelli urged him to '[b]e cool' and told him there was no more. Herring responded by leveling his gun at Marinelli's head.

{¶15} "Marinelli reached into the drawer again. This time, he pulled out a gun of his own. But by now, Marinelli was so weak that Herring easily took the gun from him. Marinelli collapsed. Herring said, 'You ain't dead yet, motherfucker,' and shot Marinelli in the legs as he lay on the floor.

{¶16} "After Herring shot Marinelli, Aziz heard Dennis Kotheimer say, 'You motherfucker.' Then she heard more shots. Marinelli saw Kotheimer get shot but did not see who shot him. Nobody saw who shot Jimmie Lee Jones.

{¶17} "Someone reported the gunshots to the Youngstown police, and officers were sent to the Newport Inn. When the officers saw the carnage inside, they summoned emergency personnel.

{¶18} "The five shooting victims were taken to a Youngstown hospital. Herman Naze and Jimmie Lee Jones were both pronounced dead on the morning of April 30. Dennis Kotheimer died on May 1.

{¶19} "Autopsies showed that each victim died of gunshot wounds to the trunk. Jones had been shot twice; one 9 mm slug was recovered from his body. Kotheimer and Naze had each been shot once, but no bullets were recovered from either victim." *State v. Herring* (2002), 94 Ohio St.3d 246, 246-48, cert. denied *Herring v. Ohio* (2002), 537 U.S. 917.

{¶20} The case proceeded to a jury trial where appellant was convicted of three counts of complicity to commit aggravated murder, two counts of attempted aggravated murder, two counts of aggravated robbery, and six firearm specifications.

The jury found that appellant was guilty of conduct involving the purposeful killing or attempt to kill two or more persons, multiple murder death-penalty specifications. It recommended the death sentence for all three murders. On February 23, 1998, the trial court sentenced appellant to death on each count, and the Ohio Supreme Court affirmed the convictions and death sentences.

{¶21} Appellant filed his postconviction petition in the trial court on September 17, 1999. He requested that the trial court declare his convictions and death sentences void or voidable. And he asked that he be granted the opportunity to conduct discovery, to amend his petition, and to be granted an evidentiary hearing pursuant to R.C. 2953.21. Appellant attached 39 exhibits, including numerous affidavits to his petition.

{¶22} Plaintiff-appellee, the State of Ohio, filed a motion for summary judgment. The trial court granted appellee's motion overruling appellant's requests for discovery and for an evidentiary hearing on January 6, 2003. Appellant filed an appeal from this judgment.

{¶23} On appeal, appellant argued in part that the trial court erred in dismissing his postconviction petition because he presented sufficient evidence to warrant an evidentiary hearing and discovery on numerous constitutional issues allegedly resulting in prejudice. The main issue he alleged was ineffective assistance of trial counsel. Specifically, appellant argued that his two trial counsel were ineffective because they only presented two witnesses at his mitigation hearing, his mother and his sister. He further argued his counsel should have presented his extensive negative history to the jury and also should have secured his neuropsychological evaluation and presented corresponding expert testimony as mitigation evidence.

{¶24} On appeal, this court found:

{¶25} "In viewing the additional evidence before this Court as a whole, it is persuasive against the imposition of the death penalty. Without a hearing to determine the extent of the mitigation evidence before Appellant's trial counsel and

their investigative efforts, Appellant's postconviction exhibits may simply present an alternative mitigation tactic. Looking at Appellant's additional evidence in a light most favorable to him, his trial counsel may have been ineffective based on their failure to pursue additional mitigation evidence." *State v. Herring*, 7th Dist. No. 03-MA-12, 2004-Ohio-5357, at ¶104.

{¶26} Consequently, we remanded the matter to the trial court to conduct an evidentiary hearing relative to trial counsel's efforts in advance of their decision to present only appellant's positive mitigation history. We specifically instructed the trial court to assess whether trial counsel were apprised of the shortcomings of Thomas Hrdy's investigation. Id. at ¶116.

{¶27} Hrdy was the mitigation specialist hired by appellant's counsel to conduct a mitigation investigation. Hrdy admitted in his affidavit, which appellant attached to his postconviction petition, that he did not complete his intended investigation and research. (Postconviction Petition, Appendix, Exh. 33). He further admitted that he provided a substandard mitigation investigation resulting from his inadequate time to prepare. (Postconviction Petition, Appendix, Exh. 33). And Hrdy stated that he failed to prepare the intended psycho-social history of appellant and his family. (Postconviction Petition, Appendix, Exh. 33).

{¶28} On remand, the trial court held a hearing. The court heard from three witnesses, appellant's two trial attorneys and a mitigation investigation specialist. The trial court concluded that Hrdy never advised trial counsel that his investigation was not complete and never asked them for additional time to complete it. It also noted that trial counsel believed that if they had given any information to the jury about appellant's criminal history, the jury would have been even more inclined to recommend death. The court concluded that trial counsel's decision to present only positive mitigation evidence was reasonable, based on an objective view of counsel's performance, measured with professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at that time. But the court denied appellant's request to present evidence as to what

evidence his counsel could have uncovered had they continued to investigate. Consequently, the trial court once again overruled appellant's postconviction petition.

**{¶29}** Appellant filed a timely notice of appeal on October 27, 2008.

**{¶30}** Appellant raises two assignments of error, the first of which states:

**{¶31}** "THE TRIAL COURT ERRED IN FINDING THAT HERRING'S TRIAL COUNSEL'S INVESTIGATION WAS REASONABLE UNDER THE PREVAILING PROFESSIONAL NORMS."

**{¶32}** On appeal, this court must affirm a trial court's decision granting or denying a postconviction petition absent an abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, at ¶58. Abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude in unreasonable, arbitrary, or unconscionable. *State v. Adams* (1980), 62 Ohio St.2d 151, 157. "[A] reviewing court should not overrule the trial court's finding on a petition for postconviction relief that is supported by competent and credible evidence." Id.

**{¶33}** Appellant argues that his counsel failed to present adequate mitigation evidence in the penalty phase of his trial. He asserts that his counsel should have presented negative evidence.

**{¶34}** The imposition of the death penalty requires that one of ten specific statutory factors is laid out in the indictment and proven beyond a reasonable doubt at trial. R.C. 2929.04(A). In this case, the jury found that appellant was guilty of killing or attempting to kill two or more people, the death-penalty factor specified in R.C. 2929.04(A)(5).

**{¶35}** After one of the R.C. 2929.04(A) factors is found to have been proven beyond a reasonable doubt, the court or jury "shall consider, and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense, *the history, character, and background of the offender*, and all of the following factors:

**{¶36}** "* * *

**{¶37}** "(3) Whether, at the time of committing the offense, the offender, *because of a mental disease or defect*, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law;

**{¶38}** "(4) The youth of the offender;

**{¶39}** "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;

**{¶40}** "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;

**{¶41}** "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death." (Emphasis added). R.C. 2929.04(B)

**{¶42}** The existence of any mitigating factors does not preclude imposition of the death penalty. R.C. 2929.04(C). However, these factors shall be weighed against the aggravating factors. R.C. 2929.04(C).

**{¶43}** At trial, appellant's counsel only presented appellant's mother's and sister's testimony in mitigation. They both presented positive information about appellant. Their entire testimony totaled seven pages. The only other argument counsel made in support of sparing appellant's life was that his co-defendants did not receive the death penalty. Counsel did not present any negative mitigation evidence on appellant's behalf going to his history, character, or background, nor did it present evidence as to any mental disease or defect appellant may have suffered from.

**{¶44}** Appellant cites to the American Bar Association's (ABA's) standards for capital defense work, which the United State Supreme Court has referred to as "guides for determining what is reasonable." *Wiggins v. Smith* (2003), 539 U.S. 510, 524. Specifically, appellant asserts that his counsel fell short in meeting the ABA's standards by failing to (1) conduct an "extensive and generally unparalleled investigation into personal and family history"; (2) explore "family and social history (including physical, sexual, or emotional abuse; family history of mental illness,

cognitive impairments, substance abuse, or domestic violence * * *)"; (3) locate and interview the client's family members; (4) conduct a multi-generational investigation; (5) choose experts who are specifically tailored to the needs of the case, instead of relying on an "all-purpose" expert; and (6) prepare to rebut arguments that improperly minimize the mitigation evidence's significance. American Bar Association: Guidelines for the Appointment and Performance of Trial Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913 (Summer 2003).

**{¶45}** First, appellant argues that his counsel could not simply defer to Hrdy's investigation. He asserts that it was his counsel's duty to ensure that the mitigation investigation was accurate and complete. He argues that they failed in this duty. Appellant contends that this failure was due to counsel's unreasonably narrow view of his mitigation defense.

**{¶46}** Appellant contends that because counsel did not conduct a complete investigation, they could not make an informed, strategic decision as to what type of mitigation defense to present. He notes that Attorney Zena hired Hrdy to conduct the mitigation investigation sometime after August 24, 1997, even though his trial was set to start on September 9, 1997 and counsel had over a year to prepare. He further notes that although his first trial ended in a mistrial on October 1, 1997, by this point Hrdy had recorded only 8.5 hours of work, half of which was for writing his report and paperwork.

**{¶47}** Appellant next points out that Attorney Van Brocklin testified that although he was disappointed in Hrdy's work, he assumed Hrdy had done all that was necessary in investigating appellant's background. He notes that Attorney Van Brocklin made this assumption after only one meeting with Hrdy. And appellant notes that Attorney Zena, who was in charge of the mitigation, testified that the extent of his investigation included speaking to appellant's mother about arranging a meeting with anybody that she thought might be helpful to mitigation.

{¶48} Based on the above, appellant argues that counsel's assumption that Hrdy's investigation was all that they needed to prepare for mitigation without any investigation on their own was unreasonable and deficient.

{¶49} Second, appellant argues that counsel's decision to present only positive mitigation evidence was unreasonable. He acknowledges that counsel wanted to emphasize the argument that he was not convicted as the principal offender. However, he contends that it was unreasonable for counsel to rely on this to the exclusion of other mitigating evidence. He points out that prior to the mitigation phase, the trial court ruled that certain defense exhibits were inadmissible as mitigating evidence. These exhibits included documents indicating the resolution of appellant's co-defendants' cases and demonstrated that none of his co-defendants received the death penalty. (Trial Tr. 4632-40; Def. Exhs. 1-14). In light of the trial court's ruling, appellant argues, counsel should have presented other mitigating evidence or asked for additional time to further investigate.

{¶50} Third, appellant notes that both counsel testified that the jury makeup had a great deal of influence on their mitigation theory. And appellant argues, assuming this is true, the composition of the jury would have no effect on how counsel conducted their mitigation investigation. Appellant further notes that a jury seated in Mahoning County is likely to vote more Democratic. Furthermore, appellant notes again that counsel failed to even secure a mitigation specialist until two weeks before trial was set to begin. Thus, no investigation was complete by the time counsel were choosing a jury. And appellant notes that both counsel conceded that they should have had an idea of what their mitigation theme would be before starting voir dire.

{¶51} To prove an allegation of ineffective assistance of counsel, the appellant must satisfy a two-prong test. First, the appellant must establish that counsel's performance has fallen below an objective standard of reasonable representation. *Strickland v. Washington* (1984), 466 U.S. 668, 687; *State v. Bradley* (1989), 42 Ohio St.3d 136, at paragraph two of the syllabus. Second, the appellant

must demonstrate that he was prejudiced by counsel's performance.  Id.  To show that he has been prejudiced by counsel's deficient performance, the appellant must prove that, but for counsel's errors, the result of the trial would have been different. *Bradley,* 42 Ohio St.3d at paragraph three of the syllabus.

**{¶52}** The appellant bears the burden of proof on the issue of counsel's effectiveness.  *State v. Calhoun* (1999), 86 Ohio St.3d 279, 289. In Ohio, a licensed attorney is presumed competent.  Id.

**{¶53}** *Strickland*, 466 U.S. 668, like the case at bar, dealt with the defendant's claim that counsel failed to conduct a full investigation in furtherance of mitigation. The Supreme Court discussed strategic choices and reasonable investigations:

**{¶54}** "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 690-91.

**{¶55}** Trial counsel holds the affirmative duty to investigate mitigating evidence.  *Rompilla v. Beard* (2005), 545 U.S. 374; *Wiggins v. Smith* (2003), 539 U.S. 510, 521; *Williams v. Taylor* (2000), 529 U.S. 362.  Trial counsel can make the decision to forego the presentation of evidence, but only after a full investigation. *Williams*, supra; *Wiggins*, supra.  Only after completing a full investigation can counsel make an informed, tactical decision about what information to present in their client's case.  *State v. Johnson* (1986), 24 Ohio St.3d 87, 90, citing *Pickens v. Lockhart* (C.A. 8, 1983), 714 F.2d 1455, 1467.

**{¶56}** As we detailed in *Herring*, 7th Dist. No. 03-MA-12, appellant attached numerous affidavits to his postconviction petition executed by family members, Hrdy,

a psychologist, and a mitigation specialist. These affidavits set out information counsel could have uncovered had they conducted a comprehensive investigation. Much of this information is highly relevant in considering the statutory mitigating factors. As stated in *Herring*, supra:

{¶57} "The extended family affidavits in the instant cause reveal: Appellant had almost a lifelong involvement in gangs (9/17/99 Postconviction Petition, Appendix, Exh. 6, p. 1 ¶ 3.); Appellant's mother abused crack cocaine for approximately 12 years while he was growing up (9/17/99 Postconviction Petition, Appendix, Exh. 6, ¶ 6, 8; Exh. 12, ¶ 10.); Appellant's father was shot and killed, apparently in a drug dispute in 1983 when Appellant was only a toddler (9/17/99 Postconviction Petition, Appendix, Exh. 7, ¶ 5; Exh. 12, ¶ 2.); Appellant started selling drugs and carrying a gun in his early teens (9/17/99 Postconviction Petition, Appendix, Exh. 8, ¶ 2, 8; Exh. 11, ¶ 4, 21; Exh. 31, ¶ 10.); growing up Appellant's stepfather was addicted to drugs (9/17/99 Postconviction Petition, Appendix, Exh. 12, ¶ 3.); Appellant abused alcohol and drugs almost daily since an early age (9/17/99 Postconviction Petition, Appendix, Exh. 9, ¶ 6; Exh. 11, ¶ 15; Exh. 29, ¶ 4; Exh. 31, ¶ 9.); Appellant dropped out of high school in the tenth grade, and his mother does not know if he ever graduated (9/17/99 Postconviction Petition, Appendix, Exh. 11, ¶ 8; Exh. 12, ¶ 14.); Appellant's grandmother's telephone calls and request to testify were unreturned by his trial counsel (9/17/99 Postconviction Petition, Appendix, Exh. 7, ¶ 2, 7.); Appellant's aunt, uncle, cousin, and grandmother would have testified had they been asked. (9/17/99 Postconviction Petition, Appendix, Exh. 6, ¶ 2; Exh. 7, ¶ 2; Exh. 29, ¶ 2; Exh. 31, ¶ 2.)

{¶58} "Appellant also points to the affidavit of Thomas J. Hrdy, the trial mitigation specialist retained by his trial counsel. Hrdy concludes that he provided a substandard mitigation investigation resulting from his lack of adequate time to prepare. (9/17/99 Postconviction Petition, Appendix, Exh. 33, ¶ 2, 5 and 7.) Hrdy states that he failed to prepare the intended and requisite psycho-social history of Appellant and his family due to time constraints. Hrdy also states that he interviewed

Appellant four times and Appellant's mother once; that he met with Appellant's lawyers once; and that Hrdy had only provided mitigation services in capital cases two or three times prior to Appellant's trial. (9/17/99 Postconviction Petition, Appendix, Exh. 33, ¶¶ 2, 5 and 7.)

**{¶59}** "While Hrdy did not do his intended and requisite research, he is uncertain whether he advised Appellant's trial counsel of his failure. (9/17/99 Postconviction Petition, Appendix, Exh. 33, ¶ 5.) Hrdy does not believe that he requested any of Appellant's historical documents or records, including those from the Ohio Department of Youth Services or Mahoning County Human Services. (9/17/99 Postconviction Petition, Appendix, Exh. 33, ¶ 8.) Attachment A to Hrdy's Affidavit sets forth his intended course of action relative to Appellant's mitigation, however, Hrdy's affidavit confirms his failure to complete most of his identified tasks. (9/17/99 Postconviction Petition, Appendix, Exh. 33.)

**{¶60}** "* * *

**{¶61}** "In addition, Appellant supplied the affidavit of Jolie S. Brams, Ph.D. a psychologist in support of this claimed error. Brams was contacted in 1998, following Appellant's conviction, in order to review the quality and thoroughness of the mitigation presented at Appellant's sentencing hearing, with regard to the requisite psychological analysis. (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 3.) Her affidavit states that the jury should have been provided a thorough analysis of Appellant and his family. (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 5-7.) She stresses that his trial counsel did not dwell on Appellant's youth (he was 19 years old at the time of the offense) and that counsel inaccurately presented Appellant's family as caring. (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 8.) Brams also stresses that the jury was never advised of Appellant's 'dysfunctional role models'. (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 8.)

**{¶62}** "Further, Brams states that, '[c]ertainly, an appropriate presentation of lay and expert witnesses would have provided the jurors with ample opportunity to

render a decision in favor of sparing the life of [Appellant].' (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 9.)

{¶63} "In addition to reviewing Appellant's historical documents, Brams also relied on the public defender mitigation specialist's interviews with Appellant and his family. (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 10.) Brams' 43-page affidavit states in part that Appellant:

{¶64} " ' * * * was not exposed to adults whose behavior placed them anywhere within the normative range of socially accepted behavior in our society. Frequent, if not daily, criminal activities, drug dealing and other illegal activities in the home, open drug and alcohol abuse, unemployment and disdain for working an honest job, and deceitfulness and manipulation, were the only adult behaviors that [Appellant] had an opportunity to emulate. * * * [Appellant] was * * * actually dissuaded from engaging in behaviors that did not fit this familiar and sociocultural norm. [Appellant] would have been an outcast of his family had he chosen to behave differently * * *.

{¶65} " '* * *

{¶66} " 'The persons given the responsibility of supervising [Appellant throughout his childhood] were intoxicated, engaging in criminal activities on a daily basis, or generally unconcerned with his functioning. These issues are a remarkably important part of [Appellant's] developmental history.

{¶67} " 'It is beyond the scope of this lengthy affidavit to detail the marked dysfunction in [Appellant's] upbringing, regarding the inappropriate behaviors to which [Appellant] was exposed, the lack of problem solving taught him in his upbringing, and the lack of supervision and stability.

{¶68} " '* * *

{¶69} " 'Lastly, substance abuse seemed to be a way for [Appellant] to self-medicate a significant degree of depression. * * *

{¶70} " '* * *

**{¶71}** " '* * * Without this presentation [of Appellant's substance abuse and history], jurors * * * saw only a young drug dealer, and user [sic] not a fully humanized portrait of a young man who was faced with serious difficulties in his life, * * *

**{¶72}** " '* * *

**{¶73}** " '[Further,] * * * even as an adult, [Appellant's] perceptual learning skills are only those of a ten-year old.

**{¶74}** " '* * *

**{¶75}** " '* * * based on his specific IQ and achievement profiles, his history which is suggestive of learning disabilities, and his chronic and early on set [sic] substance abuse, a neuropsychological evaluation should have be [sic] conducted to establish whether [Appellant] suffers from organic brain impairment. Such an evaluation should have been conducted along with a general psychological evaluation at the time of the trial. * * * ' (9/17/99 Postconviction Petition, Appendix, Exh. 1, ¶ 15, 19, 20, 29, 31, 33, 34, 38, 46.)

**{¶76}** "* * *

**{¶77}** "Appellant also points to Exhibit 18, the affidavit of Dorian L. Hall, in support of this argument. Hall's affidavit sets forth his extensive involvement in death penalty cases and stresses the importance of a psychosocial investigation and analysis for the mitigation phase of a capital sentencing. (9/17/99 Postconviction Petition, Appendix, Exh. 18, ¶ 4-5, 9-13.) Hall lists the records, documents, and the interviews that should have been conducted and analyzed in Appellant's case. (9/17/99 Postconviction Petition, Appendix, Exh. 18, ¶ 6-7.) Hall concluded that Appellant, 'should have been evaluated by a neuropsychologist to determine whether brain impairment exists.' (9/17/99 Postconviction Petition, Appendix, Exh. 18, ¶ 8.)" Id. at ¶¶70-90.

**{¶78}** All of the information set out in the affidavits goes to the R.C. 2929.04(B) factors that *shall* be considered when weighing whether to impose the death penalty.   The information likewise is considered highly relevant by the

American Bar Association's Professional Standards: "'[i]nformation concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself. *Investigation is essential to fulfillment of these functions*.'" (Emphasis sic.) *Powell v. Collins* (C.A. 6, 2003), 332 F.3d 376, 399, quoting 1 ABA Standards for Criminal Justice, Standard 4-4.1 (1982 Supp.)

{¶79} Thus, the information clearly goes to highly relevant factors. Most importantly, the information in the affidavits brought to light appellant's deeply troubled childhood, his complete lack of any positive role models, his substance abuse problems, his depression, his low IQ, and his possible organic brain impairment. These areas of appellant's life, had they been investigated and explored fully, are all very significant factors to be weighed and considered in determining what mitigation evidence to present. And counsel did not have this information before them when they made the decision to present only positive mitigation evidence. This court previously found that appellant's counsel could not have made an intelligent strategic decision without the proper investigation before them. *Herring*, at ¶100, citing *Williams v. Taylor* (2000), 529, U.S. 362, and *Glenn v. Tate* (C.A. 6, 1995), 71 F.3d 1204. And Hrdy himself admitted in his affidavit that his investigation was "substandard" and that he did not complete many of the tasks that he should have in investigating appellant's background.

{¶80} At the postconviction hearing, both attorneys said that they did not want to go the route of presenting negative mitigation evidence. For instance, Attorney Van Brocklin opined that negative information regarding appellant's life of crime would have been more ammunition for the death penalty. (Postconviction Tr. 47). He testified that the jury was conservative and he did not think that negative information would have worked well with them. (Postconviction Tr. 45). And Attorney Zena testified that he did not want to put on any negative evidence because it would "bury him [appellant] further." (Postconviction Tr. 79-80).

**{¶81}** But neither attorney was asked whether, if they knew the specifics of what was later uncovered about appellant's family life, substance abuse, low IQ, etc., would they have presented it to the jury in mitigation. Attorney Zena's testimony is especially telling. He testified that he knew nothing specific about appellant's family at the time of the trial or any negative information. (Postconviction Tr. 73, 74, 76). When asked was the decision to present only positive mitigation evidence a conscious choice, Attorney Zena responded, "*To the extent of what I thought was there*, yes." (Emphasis added; Postconviction Tr. 76). And Attorney Van Brocklin testified that he was "disappointed" in what was done by the mitigation investigator. (Postconviction Tr. 40). Attorney Van Brocklin was also asked about the mitigation theory. He stated that it was twofold: (1) to present positive information and (2) to argue that appellant was not convicted as a principal offender. (Postconviction Tr. 36). However, he then went on to state, "that basically *at the time is what we had* to -- in my estimation, to work with. *We had not received any other information from Mr. Hrdy.*" (Emphasis added; Postconviction Tr. 36).

**{¶82}** This testimony by appellant's trial attorneys further confirms that Hrdy's investigation, and therefore, trial counsel's mitigation investigation was less than adequate. And in a situation where the death penalty is to be considered, a deficient mitigation investigation is cause for grave concern. The American Bar Association Guidelines provide that investigations into mitigating evidence "'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'" (Emphasis sic.) *Wiggins*, 539 U.S. at 524, quoting ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989). Clearly, the information regarding appellant's family life and background was "reasonably available." Furthermore, counsel could not simply rely on Hrdy's investigation as Attorney Van Brocklin suggested. It is trial counsel's duty to ensure that a complete investigation is undertaken. *Wiggins*, 539 U.S. at 521; *Powell*, 332 F.3d at 399-400.

**{¶83}** We acknowledge that generally the existence of an alternative mitigation theory does not establish ineffective assistance of trial counsel. *State v. Combs* (1994), 100 Ohio App.3d 90, 105. However, this case involves more than a simple assertion that counsel should have presented other mitigation evidence. Here, given what they could have uncovered with a complete investigation, counsel had scarcely any information about appellant's background. One of his attorneys admitted that he did not know the negative things about appellant's family. Without a full picture of appellant's upbringing and family life, counsel could not have made an informed, strategic decision about what mitigation evidence to present to the jury. The defect in this case does not involve counsel's decision to present one theory of mitigation over another. Instead, the defect rests with the fact that counsel could not have made a reasonable decision about what mitigation theories to pursue given they did not have the information they needed to make such a decision.

**{¶84}** We are also mindful that counsel is not ineffective for failing to present additional witnesses whose postconviction affidavits add only additional detail to support the original mitigation theory. *State v. Williams* (1991), 74 App.3d 686, 695. But "the facts herein reveal that the postconviction evidence dehors the record presents not additional evidence or detail, but a completely opposite line of evidence." *Herring*, 7th Dist. No. 03-MA-12, at ¶99.

**{¶85}** Two United States Supreme Court cases in particular support our decision.

**{¶86}** In *Wiggins*, 539 U.S. 510, the Supreme Court found Wiggins' trial counsel was ineffective for failing to fully investigate Wiggins' life history. Wiggins' counsel drew from three sources in presenting his mitigation evidence: psychologist reports regarding Wiggins' IQ, trouble coping, and possible personality disorder; a written presentence investigation with a one-page description of his childhood; and Department of Social Services (DSS) records documenting Wiggins' foster home placements. The Court found that counsels' decision not to expand their investigation fell below the prevailing professional standards. Id. at 524. The Court

pointed to various other avenues counsel could have pursued including the preparation of a social history report, which would have been paid for by the public defender's office, and delving into the limited information contained in the DSS report that Wiggins' mother was an alcoholic, Wiggins was shuttled from foster home to foster home, he had extended school absences, and at least once his mother left him and his siblings alone for days without food. Id. at 524-25. The Court determined that "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses, particularly given the apparent absence of any aggravating factors in petitioner's background." Id. at 525.

{¶87} And in *Rompilla*, 545 U.S. 374, at the syllabus, the U.S. Supreme Court held "that even when a capital defendant's family members and the defendant himself have suggested that no mitigating evidence is available, his lawyer is bound to make reasonable efforts to obtain and review material that counsel knows the prosecution will probably rely on as evidence of aggravation at the sentencing phase of trial." The extent of defense counsel's mitigation evidence was testimony from five family members arguing residual doubt and professing their belief that Rompilla was a good man and testimony from Rompilla's 14-year-old son that he loved his father and would visit him in prison. This was after counsel interviewed Rompilla and the five family members and examined reports by three mental health witnesses. The Supreme Court reversed the Circuit Court of Appeals' determination that counsel's investigation was reasonable. In so doing, the Court found that trial counsels' investigative efforts were unreasonable because they failed to look at the file on Rompilla's prior conviction, which they knew was in the state's possession. Id. at 390. The Court pointed out that had counsel examined just this one file, they would have found a range of mitigation leads to follow particularly regarding Rompilla's dreadful childhood, low intellectual functioning, and possible alcoholism. Id. The Court concluded:

**{¶88}** "This evidence adds up to a mitigation case that bears no relation to the few naked pleas for mercy actually put before the jury, and although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test. It goes without saying that the undiscovered 'mitigating evidence, taken as a whole, "might well have influenced the jury's appraisal" of [Rompilla's] culpability,' *Wiggins v. Smith,* 539 U.S., at 538, 123 S.Ct. 2527 (quoting *Williams v. Taylor,* 529 U.S., at 398, 120 S.Ct. 1495), and the likelihood of a different result if the evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing, *Strickland,* 466 U.S., at 694, 104 S.Ct. 2052." Id. at 393.

**{¶89}** In considering whether trial counsel exercised reasonable professional judgment, the central question "is not whether counsel should have presented a mitigation case. Rather, we focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence of * * * [the defendant's] background *was itself reasonable."* (Emphasis sic.) *Wiggins*, 539 U.S. at 522-23. Given the wealth of mitigating evidence that could have been discovered in this case had counsel conducted a thorough investigation into appellant's childhood, family background, and mental condition, we cannot conclude that the investigation itself was reasonable. "[A] lack of reasonable investigation and preparation for the sentencing phase of a capital trial constitutes ineffective assistance of counsel." *State v. Johnson* (1986), 24 Ohio St.3d 87, 89. Absent a full investigation, counsel could not have made an informed decision on what mitigation evidence to present. "'[I]t is only *after* a full investigation of *all* the mitigating circumstances that counsel can make an informed, tactical decision about which information would be most helpful to the client's case.'" (Emphasis sic.) Id., quoting *Pickens v. Lockhart* (C.A. 8, 1983), 714 F.2d 1455.

**{¶90}** Based on the foregoing, we must conclude that the trial court's decision denying postconviction relief was an abuse of discretion. As the United States Supreme Court concluded in *Rompilla*, the undiscovered mitigating evidence in this

case " ' "might well have influenced the jury's appraisal" ' " of appellant's culpability and the probability of a different sentence if counsel had presented the evidence is "'sufficient to undermine confidence in the outcome'" reached by the jury. (Internal citation omitted.) 545 U.S. at 393. Accordingly, appellant's first assignment of error has merit.

**{¶91}** Appellant's second assignment of error states:

**{¶92}** "THE TRIAL COURT ERRED WHEN IT PRECLUDED HERRING FROM PRESENTING EVIDENCE REGARDING MITIGATION THAT COULD HAVE BEEN PRESENTED HAD TRIAL COUNSEL PERFORMED AN ADEQUATE INVESTIGATION."

**{¶93}** Because we have already concluded that the mitigation investigation was inadequate, appellant's second assignment of error is moot.

**{¶94}** For the reasons stated above, appellant's postconviction petition is hereby granted. The judgment of the trial court imposing the death sentences is reversed. This matter is remanded to the trial court for a new sentencing hearing to be conducted pursuant to R.C. 2929.06, whereby a jury shall be impaneled to consider whether to once again impose the death penalty or to instead impose life in prison.

Vukovich, .J., concurs.

Waite, P.J., concurs. In judgment only.