O’Neill, J.,
concurring in part and dissenting in part.
{¶ 354} I concur in the majority’s resolution of Calvin McKelton’s various propositions of law, with the exception of his 16th and 20th propositions. Respectfully, I must dissent as to the majority’s rejection of McKelton’s argument that his counsel were ineffective for failing to investigate a mitigation defense. I would hold that State v. Hester, 45 Ohio St.2d 71, 341 N.E.2d 304 (1976), applies in this unique case. Furthermore, I must dissent from the majority’s decision to affirm McKelton’s sentence of death for the reasons I discussed in my dissent in State v. Wogenstahl, 134 Ohio St.3d 1437, 2013-Ohio-164, 981 N.E.2d 900.

Unreasonable Professional Assistance

{¶ 355} About one month before McKelton’s trial, the state revealed that one of McKelton’s attorneys represented more than one of the state’s undisclosed witnesses, suggesting conflict-of-interest issues during trial. That attorney acknowledged his potential ethical conflict but said that he was reluctant to withdraw because he was unsure whether McKelton’s other two co-counsel could effectively represent him. Two weeks later, all three defense counsel filed a motion for leave to withdraw from representation, for appointment of new counsel, and for a continuance to allow new counsel to prepare for trial. The attorneys cited a complete breakdown in the attorney-client relationship. That same day, McKelton filed a handwritten motion requesting the removal of all defense counsel. At a hearing on the motions two weeks before trial, the court granted the conflicted attorney’s motion to withdraw. One of the two remaining attorneys, both certified by the Ohio Supreme Court as lead counsel in capital-murder cases, told the court that his and co-counsel’s relationship with McKelton had disintegrated to the point that they could no longer “effectively represent him.” McKelton, speaking from a written statement, claimed, among other things, that his attorneys had not hired the “special experts” necessary for his death-penalty case. He added that the two remaining attorneys had met with McKelton privately only twice and that they had pressured him in the presence of an officer to plead guilty in exchange for life without parole, instead of properly investigating his case and going to trial. He claimed that one of the remaining attorneys called him a “dumb n * * * * r” after he refused to take the plea agreement. He also asserted that they had aligned themselves with the prosecutor.
*326 {¶ 356} The court denied the motions to allow the remaining attorneys to withdraw. The court stated that the case preparations were proceeding in an orderly fashion and that McKelton had had three attorneys and four experts[11] working on his ease. The court further pointed to the American Bar Association’s 2003 Standards for Capital Litigation and told McKelton that he had been given more than the minimum recommended defense team of two attorneys and one mitigation expert. However, the record before us shows the hiring of only one investigator. The investigator worked primarily with the conflicted attorney prior to trial. One of the capital-certified attorneys met with the investigator once in June, and again the day before trial. The other capital-certified attorney met with the investigator only on the day before trial. No other experts submitted bills after trial.
{¶ 357} At the mitigation hearing, the attorneys did not present any documentary evidence of the sort that a trained mitigation specialist might find or provide.[12] But I have no doubt that this evidence exists. The record shows that McKelton was neglected as a child, when he was also exposed to his mother’s drug use and prostitution. He grew up to become a violent and abusive adult. McKelton and a witness detailed instances of heavy alcohol use in response to strong emotional stimuli. In the modern era, people who live such a life generate a paper trail. Yet at the mitigation hearing, McKelton’s attorneys presented only the testimony of his daughter, his mother, and Crystal Evans, the sister of victim Germaine Evans.
*327 {¶ 358} To me, the record shows that McKelton’s attorneys did not hire, but should have hired, a mitigation specialist to investigate his background, in addition to one or more mental-health professionals if the mitigation specialist’s investigation suggested a need. During our independent weighing of the mitigating and aggravating factors in prior cases, we have given great cumulative weight not only to direct evidence of a background of alcohol use, violence, and abuse like McKelton’s but also to the testimony of an expert capable of explaining to a jury the psychological and social effect that this sort of experience can have on a human being. State v. Johnson, 144 Ohio St.3d 518, 2015-Ohio-4903, 45 N.E.3d 208, ¶ 118-124, 137. Accord State v. Tenace, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 86-96, 105; see also Goodwin v. Johnson, 632 F.3d 301, 324-326 (6th Cir.2011). Instead of arranging for the inquiry of a mitigation expert, counsel went so far as to tell the jury that McKelton could have presented testimony of a mental-health professional but that such testimony would have been “a bunch of psycho babble.” Frankly speaking, a license to practice law does not qualify counsel to make that decision for a client.[13]
{¶ 359} The majority points to trial counsel’s statements that they had hired the experts for which funding had been authorized. Majority opinion at ¶ 307. But the record shows that no expert with qualifying social-work or psychological degrees or experience showed up asking for even a small amount of money. This strongly undermines the majority’s position about what happened while counsel prepared for this case. The best the majority can say is that “trial counsel may have reasonably decided not to present a mental-health professional or a mitigation specialist for strategic reasons.” Id. But on this record as a whole, I must respectfully disagree. I believe it is much more likely that counsel unreasonably decided not to engage any qualified person as a matter of expedience. Wiggins v. Smith, 539 U.S. 510, 533, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003), quoting Strickland v. Washington, 466 U.S. 668, 691, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (“A decision not to investigate thus ‘must be directly assessed for reason *328 ableness in all the circumstances’ ”); State v. Johnson, 24 Ohio St.3d 87, 90, 494 N.E.2d 1061 (1986). And without someone qualified to screen McKelton for the possible psychological and social consequences of his hard-lived background, there cannot have been the constitutionally guaranteed reasonable professional investigation. Strickland at 691 (“counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary”). Accord State v. Herring, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 76-77. For these reasons, I would hold that McKelton satisfied his burden to prove unreasonable professional assistance.

Prejudice

{¶ 360} I believe that the circumstances in this exceptional case demand a legal standard less rigid than the one applied under Strickland. Under Strickland, “[a]n accused is entitled to be assisted by an attorney, whether retained or appointed, who plays the role necessary to ensure that the trial is fair.” Id. at 686. Counsel plays that role by subjecting the state’s case to “the crucible of meaningful adversarial testing.” United States v. Cronic, 466 U.S. 648, 656, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). When an attorney fails to play that role, the Sixth Amendment to the United States Constitution requires confidence in the reliability of the outcome of a proceeding. Strickland at 696. For that reason, a professional error by counsel “does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment.” Id. at 691.
{¶ 361} In Ohio as elsewhere, courts have boiled off the fat of the Sixth Amendment, applying a mechanical “Strickland test” that requires meeting two prongs: (1) demonstrating deficient performance of counsel and (2) demonstrating prejudice. Id. at 691; State v. Bradley, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus, citing Strickland at 691. In this case, the majority holds that McKelton cannot meet the prejudice prong under Strickland, given the record before us. Majority opinion at ¶ 305. We “cannot look outside of the record” in a death-penalty appeal, State v. Dixon, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, ¶ 62, to determine what evidence a mitigation or mental-health specialist would have found or offered for McKelton in support of a sentence less than death.
{¶ 362} In Hester, issued eight years before Strickland, we formulated a somewhat different standard for determining ineffective assistance of counsel under Article I, Sections 10 and 16 of the Ohio Constitution. Hester, '45 Ohio St.2d 71, 341 N.E.2d 304. There, we held that the test for ineffective assistance of counsel under “the Fifth, Sixth and Fourteenth Amendments, and Sections 10 and 16 of Article I of the Ohio Constitution” was “whether the accused, under all *329 the circumstances, * * * had a fair trial and substantial justice was done.”[14] Hester at 79. We decided to apply this test “on a case-to-case basis,” likening that approach to application of the exclusionary rule under the Fourth Amendment. Id. at 80. We are thus empowered to apply Hester selectively. And we have been cautious in not letting these floodgates open too far, having applied the “fair trial and substantial justice” standard only twice in the last century: in Hester and in Cornwell v. State, 106 Ohio St. 626, 628, 140 N.E. 363 (1922).
{¶ 363} Despite rare application, Hester is nonetheless controlling precedent governing the standard for ineffective assistance of counsel under Sections 10 and 16 of Article I of the Ohio Constitution, as we have never explicitly overruled it. Shortly after Hester, we elaborated upon this standard, saying that when considering effective-assistance claims, a two-step analysis like the one that would later be adopted in Strickland is “usually” applied. State v. Lytle, 48 Ohio St.2d 391, 396, 358 N.E.2d 623 (1976), vacated in part on other grounds, Lytle v. Ohio, 438 U.S. 910, 98 S.Ct. 3135, 57 L.Ed.2d 1154 (1978). After Strickland, we commented, without any analysis, that “[t]he test enunciated in Strickland is essentially the same” as the one we adopted in Hester and Lytle. State v. Smith, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985); see also Bradley, 42 Ohio St.3d at 141-142, 538 N.E.2d 373. But Hester is still good law. After all, the Ohio Supreme Court does not overrule precedent sub silentio. See Westfield Ins. Co. v. Galatis, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, ¶ 1 (“It is only with great solemnity and with the assurance that the newly chosen course for the law is a significant improvement over the current course that we should depart from precedent”).
{¶ 364} As we said in Smith, the rules laid down in Strickland and Hester are the same in essence, but they are not identical standards. Smith at 100. In the typical case, “substantial justice” is done because the record suggests no reasonable probability that the outcome of a proceeding would have been different. It is analytically possible in rare and exceptional circumstances, however, that an individual may be able to show that counsel’s assistance fell so far below the minimum professional standards that the proceeding was basically unfair and substantially unjust, even if the record suggests that the outcome of a proceeding would probably not have been different. In those circumstances, Hester requires a new trial.
{¶ 365} Hester is uniquely appropriate for application in capital-murder cases because the demands of due process are at their strongest when the result of a *330 proceeding may be death. See Ford v. Wainwright, 477 U.S. 399, 414, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986) (discussing the “heightened-.concern for fairness and accuracy that has characterized the [United States Supreme Court’s] review of the process requisite to the taking of a human life”). This is especially true because Hester1 s standard is predicated upon both the guarantees of counsel, Ohio Constitution, Article I, Section 10, and of due process, Ohio Constitution, Article I, Section 16. Hester, 45 Ohio St.2d at 79, 341 N.E.2d 304. At its heart, the Hester standard differs from Strickland because of the unique guarantee of “justice” within Article I, Section 16 of our state constitution — a word that goes unmentioned by the Bill of Rights or the Fourteenth Amendment to the United States Constitution. In contrast, Strickland’s standard is a pure creature of the Sixth Amendment, which is focused upon the reliability of the proceeding. Strickland, 466 U.S. at 691, 104 S.Ct. 2052, 80 L.Ed.2d 674. The United States Constitution guarantees a fair trial under the Fourteenth Amendment through application of the Sixth Amendment — not so much independently from it. Id. at 684-685.
{¶ 366} Throwing McKelton into the fray with attorneys he had barely met was profoundly unfair: their task was to provide the jury with a detailed story of the person that they represented. I am convinced that McKelton’s attorneys were insufficiently prepared to go forward at the mitigation hearing due to a professionally inadequate investigation prior to trial and the unexpected scramble of taking over the work of another seasoned trial attorney. For these reasons, I have no faith in the jury’s recommended sentence. I will not place the ends of justice — a reliable outcome — before the means of justice in the context of a capital-sentencing hearing. For that reason, I am entirely comfortable reversing McKelton’s death sentence without strict proof in the record that counsel would have turned up silver-bullet mitigation evidence had they hired an expert to look for it. For me, it is enough that counsel did not hire an expert qualified to look before deciding not to present any “psycho-babble.” Accordingly, I would apply Hester, reverse McKelton’s death sentence, and remand for a new mitigation hearing.
{¶ 367} The majority instead rejects McKelton’s argument that his attorneys were ineffective for failing to conduct a complete investigation into his background prior to mitigation. The majority does not limit or overrule our decision in State v. Herring, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 102-104, in which we held that counsel have a duty to conduct at least enough investigation of potential mitigation evidence to make a reasonable decision not to investigate further. Rather, the majority thinks that McKelton’s ineffective-assistance argument necessarily requires evidence of prejudice that may exist outside the record, which we cannot consider in this appeal. Majority opinion at ¶ 79; State v. Keith, 79 Ohio St.3d 514, 536-537, 684 N.E.2d 47 (1997). McKel- *331 ton’s prejudice claim is proper for a postconviction proceeding because he could develop a record by which to compare the evidence found and presented by postconviction counsel to the evidence presented by trial counsel. Keith at 536-537, citing State v. Scott, 63 Ohio App.3d 304, 308, 578 N.E.2d 841 (8th Dist.1989).

Collateral Proceedings

{¶ 368} McKelton’s postconviction petition is currently pending as a discretionary appeal to this court. His petition to the trial court argued, among other things, that counsel failed to conduct an adequate mitigation investigation, requested leave to conduct discovery on that issue, and requested funds to hire “a forensic ophthalmologist, a neuropsychologist and a substance abuse expert.” State v. McKelton, 12th Dist. Butler No. CA2015-02-028, 2015-Ohio-4228, 2015 WL 5934140, ¶ 4, 8. McKelton’s petition was denied without a hearing, and not because he failed to “ ‘set forth sufficient operative facts to establish substantive grounds for relief.’ ” Id. at ¶ 10, quoting State v. Calhoun, 86 Ohio St.3d 279, 714 N.E.2d 905 (1999), paragraph two of the syllabus. Instead, McKelton’s petition was denied on the sole basis of res judicata, because all the claims he raised had already been raised or could have been raised in this appeal.
{¶ 369} The court of appeals affirmed on appeal, explaining that the same ineffective-assistance argument this court now declines to address due to lack of evidence in the record is the kind of argument that “ ‘could fairly have been determined without resort to evidence outside the record.’ ” Id. at ¶ 27, quoting State v. Sturgill, 12th Dist. Clermont Nos. CA2014-01-003 and CA2014-07-049, 2014-Ohio-5082, 2014 WL 6152865, ¶ 13. As a result, there has been no hearing or discovery, nor has there been any real consideration of the merits of McKelton’s argument. Nobody has called trial counsel out onto the carpet to ask whether they came to a reasonable professional decision not to use the information in McKelton’s “one thousand plus pages of exhibits” submitted with his postconviction-relief petition, Id. at ¶ 8, or simply never hired a mitigation specialist qualified and trained to look for it.
{¶ 370} Justice has not been served. Even agreeing that McKelton is one of the most dangerous criminals in the state, who admitted his own responsibility in starting what sounds like a war among drug dealers in Cincinnati, he is a human being, guaranteed the minimum constitutional protections of a fair trial, with adequate counsel and meaningful appellate review. I sincerely hope that my colleagues will take action when McKelton’s postconviction appeal comes before the court for consideration. If we do not accept McKelton’s discretionary appeal, his ineffective-assistance argument will have been denied by every court involved, *332 without a single judge taking a critical look at the evidence outside of the record and determining whether his trial attorneys did or did not look for it.
Michael Gmoser, Butler County Prosecuting Attorney, and Michael A. Oster Jr. and Lina N. Alkamhawi, Assistant Prosecuting Attorneys, for appellee.
Timothy Young, Ohio Public Defender, and Rachel Troutman, Allen Vender, and Shawn Welch, Assistant Public Defenders, for appellant.
{¶ 371} For these reasons, I dissent.
Pfeifer, J., concurs in the foregoing opinion except as noted in his separate opinion.

. At the arraignment almost eight months before, the court granted funds to hire an investigator, a mitigation specialist, a mental-health professional, and forensic experts.

.
Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant’s development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. Moreover, they may be critical to assuring that the client obtains therapeutic services that render him cognitively and emotionally competent to make sound decisions concerning his case.
Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict
(Footnote omitted.) American Bar Association Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Guideline 9.1, Commentary, reprinted in 31 Hofstra L.Rev. 913, 959 (2003).

.
Counsel’s own observations of the client’s mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance. Accordingly, Subsection A(2) mandates that at least one member of the defense team (whether one of the four individuals constituting the smallest allowable team or an additional team member) be a person qualified by experience and training to screen for mental or psychological disorders or defects and recommend such further investigation of the subject as may seem appropriate.
(Footnote omitted.) American Bar Association Guidelines, Guideline 4.1, Commentary, reprinted in 31 Hofstra L.Rev. at 956-957.

. The two-part test in Strickland preempts Hester on its interpretation of the United States Constitution. United States Constitution, Article VI, cl. 2.